IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TODD HARMS                                                              PLAINTIFF

v.                              Civil No. 2:21-cv-02095-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Todd Harms, brings this action under 42 U.S.C. § 405(g), seeking judicial review

of a decision of the Commissioner of Social Security Administration (the "Commissioner")

denying his claim for a period of disability and disability insurance benefits ("DIB") under Title

II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A).  In this judicial

review, the Court must determine whether there is substantial evidence in the administrative record

to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.        Procedural Background

Plaintiff was found disabled as of February 9, 2009, his alleged onset date, in a decision by

Administrative Law Judge ("ALJ") Glenn A. Neel on July 19, 2010.  (ECF No. 11, pp. 151-155).

Plaintiff was determined to have severe impairments of degenerative disc disease of the lumbar

spine status post-surgery, major depressive disorder, and generalized anxiety resulting in a residual

functional capacity ("RFC") of sedentary work as defined in 20 C.F.R. § 404.1567(a), except that

he could only occasionally climb ramps and stairs and could occasionally balance and stoop; could

never climb ladders, ropes, or scaffolds or kneel, crouch, or crawl, and he was unable to complete

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant
to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the Defendant in this
suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the
Social Security Act, 42 U.S.C. § 405(g).

a normal workday and workweek on a regular and continuing basis due to severe pain; he could perform work where interpersonal contact would be incidental to the work performed, complexity of tasks was learned and performed by rote with few variables and use of little judgment, and supervision required was simple, direct, and concrete. *Id.* at 153. ALJ Neel, in his step-five conclusion, determined that Plaintiff was unable to perform any work existing in the national economy. *Id.* at 155.

On December 21, 2012, the Social Security Administration (the "Agency") conducted a continuing disability review and determined that Plaintiff's disability continued based on finding that medical improvement had not occurred. (ECF No. 11, pp. 156-157).

The Agency conducted a second continuing disability review on March 10, 2017, and it determined that Plaintiff's disability had ceased as of March 10, 2017, and his benefits would terminate on May 31, 2017, based on a finding that medical improvement had occurred. (ECF No. 11, p. 158). At Plaintiff's request, a Disability Hearing Officer, Susan North ("Officer North"), held a hearing on May 9, 2017. (ECF No. 11, pp. 224, 230). Plaintiff and his wife, Amanda Harms, were present. *Id.* at 234. On June 29, 2017, Officer North concluded that Plaintiff was no longer precluded from performing even a sedentary level of work on a regular basis, or to complete a normal workday due to pain, but was now capable of performing a wide range of light work. *Id.* at 246-259. Officer North thus determined that medical improvement had occurred, said improvement was related to his ability to work, and, therefore, Plaintiff was not disabled. *Id.*

At Plaintiff's request, ALJ Edward M. Starr held an administrative hearing on October 26, 2017. (ECF No. 11, pp. 48-89, 263-293). Plaintiff was present and represented by counsel. *Id.* at 49. On February 13, 2018, ALJ Starr concluded that Plaintiff's disability had ended on March 10, 2017. *Id.* at 164-174. The Appeals Council remanded the case to ALJ Starr on July 18, 2018,

based, *inter alia*, on the need for further consideration of Plaintiff's disability status after March 10, 2017. *Id*. at 183-186. ALJ Starr held a second hearing on July 23, 2019, at which Plaintiff was present and represented by counsel. *Id*. at 91-108. On August 20, 2019, ALJ Starr issued a second unfavorable decision in Plaintiff's case, finding Plaintiff's disability had ended on March 10, 2017, and that he had not become disabled again since that date under 20 C.F.R. § 404.1594(f)(8). *Id*. at 188-210.

The Appeals Council remanded the case for a second time on April 20, 2020, based, *inter alia*, on the need for further evaluation of Plaintiff's RFC as the rationale provided in the hearing decision was not found to support that Plaintiff was as limited as ALJ Starr determined. (ECF No. 11, pp. 213-216). Additionally, the Appeals Council directed the case be assigned to another ALJ. *Id*. at 215.

On December 9, 2020, ALJ Harold Davis held an administrative hearing at which Plaintiff was present and represented by counsel. (ECF No. 11, pp. 110-146). ALJ Davis issued his unfavorable decision in Plaintiff's case on January 13, 2021, finding medical improvement had occurred on May 1, 2017,[2] and Plaintiff could perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could not be exposed to dust, fumes, smoke, or temperature extremes, and he could occasionally climb, balance, crawl, kneel, stoop, or crouch. *Id*. at 17-28. With the assistance of a vocational expert ("VE"), ALJ Davis concluded that Plaintiff could perform work as a school bus monitor, counter clerk, and office helper. *Id*. at 27-28. Plaintiff was found not to

---

[2] The undersigned notes that ALJ Davis appears to utilize May 1, 2017, as both the date Plaintiff's disability allegedly ended, and the date benefits ceased. We note that the record reflects previous findings that Plaintiff's disability allegedly ended on March 10, 2017, and benefits ceased on May 31, 2017. For clarity, this Report and Recommendation will utilize the date ALJ Davis used in his decision, May 1, 2017, to reference the date Plaintiff's disability allegedly ended and the date benefits ceased.

be under a disability from the date his disability ended on May 1, 2017, through the date of the ALJ's decision. *Id*. at 28.

The Appeals Council denied Plaintiff's request for review on March 24, 2021. (ECF No. 11, pp. 8-11). Plaintiff then filed this action on May 17, 2021. (ECF No. 2). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 14, 18), and the case is ready for decision.

## II.     Summary of the Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. Because Plaintiff's appeal concerns his physical impairments, namely his degenerative disc disease of the lumbar spine post-surgery, the undersigned will only recount evidence relevant to Plaintiff's claim.

On September 20, 2016, Michael Westbrook, M.D., conducted a consultative examination of Plaintiff. (ECF No. 11-1, pp. 86-91). Plaintiff reported back problems and arthritis, but the examination revealed no muscle spasms or weakness. *Id*. at 89. His lumbar and cervical spine range of motion was within normal limits, but he exhibited positive straight leg raising on the right at 45 degrees. *Id*. at 88-89. Dr. Westbrook noted a sensory abnormality of decreased pinprick of the entire right foot. *Id*. Plaintiff complained of right hip pain and was unable to walk on his toes. *Id*. A lumbar spine x-ray showed mild degenerative disc disease. *Id*. at 90. The diagnosis was status post back surgery with residual pain, and Dr. Westbrook opined Plaintiff had moderate limitations based on this evaluation. *Id*.

On March 9, 2017, State agency medical consultant Lucy Sauer, M.D., completed a medical evaluation of Plaintiff and considered Plaintiff's recent treatment up to that date, including the consultative examination report by Dr. Westbrook. (ECF No. 11-1, pp. 161-162). Dr. Sauer noted a fraud report conducted in March 2017, showing "copious examples of [Plaintiff] being

extremely physically active."  Dr. Sauer noted that the only physical limitation observed in the report was a "slightly abnormal gait with no pain indicators."  In addition, Dr. Sauer pointed to Plaintiff's activities of riding heavy motorcycles, frequent riding of ATVs in national forests, extensive traveling, being active in Scouts for at least six years, tilling a garden with a tractor, cooking, shopping, and shoveling ginseng roots in the woods for sale.  Dr. Sauer concluded that medical improvement had occurred, and that Plaintiff had non-severe physical impairments.  *Id*. 162.

On March 29, 2017, Plaintiff submitted a pain questionnaire claiming that constant, daily hip pain, leg and back pain, numbness in feet, and right shoulder and right-hand pain limited all his activities, including walking, standing, and sitting.  (ECF No. 11, pp. 561-562).  He claimed that he could stand and walk just five minutes, and sit up to 10 minutes, before pain occurred. Besides medication, only lying down in his right side provided any relief.  *Id*.

On April 3, 2017, Plaintiff submitted a function report claiming that he could not work due to his inability to stand or sit in any position for more than five minutes at a time.  (ECF No. 11, pp. 563-570).  On a typical day he only watched television, ate, and napped.  He did not provide care for anyone else, and he did not sleep well due to pain in his back, hip, and shoulders.  *Id*. at 564.  He claimed that he had problems with almost every aspect of personal care due to pain, including bending to put on shoes and socks and to bathe, holding a razor to shave, and sitting on the toilet at times.  *Id*.  He reported that he did no cooking, no housework, and no yardwork due to pain in his hips, back, shoulders, and hands.  *Id*. at 565-566.  He explained that he could neither push nor pull objects, and that lifting and carrying were impossible for him.  He could go out alone sometimes for short trips, and his wife did most of the driving as his hip, back, and right hand would go numb if he drove.  *Id*. at 566.  He did not shop, and his only hobby was watching

television.  He could attend church with accompaniment just once a month.  *Id*. at 566-567.

Plaintiff also claimed that his conditions affected his lifting, standing, walking, sitting, stair

climbing, kneeling, squatting, reaching, using hands, bending, understanding, following

instructions, concentrating, completing tasks, getting along with others, and memory.  *Id*. at 568.

He could walk up to 50 feet before resting.  Plaintiff reported that he was prescribed a cane three

years ago by his surgeon and that he continued to use it daily.  *Id*. at 568-569.

On April 6, 2017, State agency medical consultant Jim Takach, M.D., affirmed the findings

of Dr. Sauer.  (ECF No. 11-1, p. 163).

Wanting to change providers from Dr. Westbrook, Plaintiff saw Yvonia Finley, CNS, on

April 10, 2017, reporting back and joint pain.  (ECF No. 11-1, pp. 200-201).  The examination

revealed tenderness of the lumbar spine and spinous processes, as well as knee crepitus bilaterally

with no deformities and with full range of motion of the extremities.  *Id*. at 201.  CNS Finley

diagnosed low back pain, depression, osteoarthritis, and knee pain, and the treatment plan started

Plaintiff on Cymbalta and Meloxicam.[3]  *Id*.

Plaintiff returned to CNS Finley on May 2, 2017, complaining of a painful right ring finger,

inability to tolerate Cymbalta, fatigue, and various joint pains.  (ECF No. 11-1, pp. 197-199).  On

examination, Plaintiff exhibited tenderness from the thoracic spine to the lumbar spine area in the

spinous processes, in the facet joints bilaterally, and in the sacroiliac joints and iliac crest.  *Id*. at

198.  CNS Finley also noted crepitus in bilateral knees, pain in the right middle finger and point

tenderness in the ring finger with slight swelling.  *Id*.  Plaintiff was to continue Cymbalta as it

would also manage his neuropathic pain from back surgery.  As he also reported shortness of

---

[3] Cymbalta is used to treat depression and generalized anxiety disorder.  *See* Duloxetine,
https://medlineplus.gov/druginfo/meds/a604030.html (last accessed July 28, 2022); meloxicam is used to relieve
pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis.  *See* Meloxicam
https://medlineplus.gov/druginfo/meds/a601242.html (last accessed July 28, 2022).

breath, Plaintiff would be referred to Dr. Alemparte.  *Id.* at 198-199.  An x-ray of the right-hand revealed a collection of calcifications ventral and ulnar to neck and head of the right long finger proximal phalanx, some of which could be within the flexor tendon sheath and post-traumatic; scattered degenerative changes primarily involving the thumb and wrist; and small calcification overlying the long finger MCP joint, which could be a sesamoid bone or loose body.  *Id*. at 186.

Complaining of pain in his right hip, back, and leg, Plaintiff sought treatment with CNS Finley again on May 17, 2017.  (ECF No. 11-1, pp. 193-195).  He weighed 237 pounds with a BMI of 29, and, on examination, he exhibited tenderness of the lumbar spine, right hip, and sacroiliac joint.  *Id.* at 193-194.  Plaintiff also displayed pain with active range of motion of the right hip through the gluteal muscle group and right leg, but no deformities and no erythema.  *Id*. at 194.  CNS Finley assessed sciatica, back pain, shortness of breath, hypocholesteremia, and hyperlipidemia.  *Id*.  Plaintiff received over-the-counter anti-inflammatories and was advised on in-home physical therapy.  *Id.*  CNS Finley would consider a low back x-ray if Plaintiff's pain did not improve.  *Id.*

Eight days later on May 25, 2017, a lumbar spine MRI showed "[l]aminotomy right L4-L5 with retrolisthesis of L4 on L5, uncovered disc and some diffuse bulge with some disc protrusion centrally and in the right with foraminal stenosis and mild canal stenosis, unchanged from previous."  (ECF No. 11-1, pp. 206-207).  It also showed "[a]nterolisthesis L5 on S1 by 7-8 mm with uncovered disc, cephalad extrusion of disc midline and to the left with foraminal stenosis left, in combination with facet hypertrophy.  This is also unchanged from prior study."  *Id*.  The final impression of the study stated, "No progressed findings."  *Id*.

Plaintiff saw cardiologist J. Alemparte, M.D. for a cardiac evaluation on May 26, 2017.  (ECF No. 11-1, pp. 213-214).  Dr. Alemparte's examination of Plaintiff revealed no edema and

that he was alert and oriented. Plaintiff was assessed for angina, shortness of breath, and fatigue. *Id.* Dr. Alemparte continued Plaintiff's medications and, as symptoms were suggestive of ischemia, scheduled a Lexiscan MPI and echocardiogram. *Id.* at 214. An EKG and MPI (myocardial perfusion imaging) performed on May 30, 2017, showed no changes suggestive of ischemia and no evidence of perfusion defects, and Plaintiff's ejection fraction was 45%. *Id.* at 230-31.

On June 29, 2017, Officer North issued her report and conclusion following Plaintiff's disability hearing with the Agency on March 17, 2017. (ECF No. 11, pp. 234-260). Officer North included a summary of the results of an investigation conducted by the Cooperative Disability Investigations Unit ("CDIU") in February 2017 based on inconsistencies between Plaintiff's reported functional limitations and the objective medical records. *Id.* at 251. Officer North's summary stated in relevant part:

> According to the investigative report, the claimant stated that 'he is involved with the Boy Scouts of America as an assistant leader.' Weekends, he is involved with his buddies, riding ATVs in the nearby national forests. He shops every week or two in Fort Smith or Clarksville at the Wal Mart stores because there 'aren't any decent stores in Ozark.' In 2016, he would search for ginseng roots, which he would dig up with a shovel. He sold them to a company in Missouri. He was observed to walk out the front door of his residence and down the stairs without devices or assistance. His gait did appear somewhat abnormal, but he was able to move quickly and fluidly when he led the investigators into his home for the interview while navigating the stairs, once more, without hesitation. He did not appear to be in any pain or discomfort. He sat at the dining room table for the interview, which lasted approximately thirty minutes. He was observed to rise from a seated position to retrieve paperwork several times. He moved at a hurried pace each time with no hesitation and expressed no pain or discomfort. He was able to lean and reach / stretch over a 'baby gate' between the dining room and kitchen and retrieve paperwork from a drawer. Again, he was fluid in his motion and there was no indication of limited mobility.
>
> The CDIU report also contains pictures printed from the claimant's Facebook postings. Even though he alleges his lifestyle may be restricted because of his conditions of disability, his digital persona suggests he is active with interests and hobbies, is highly social (online and offline) and involved in his community.

(ECF No. 11, p. 251).

Officer North also summarized the medical evidence from May 2015 through November 2015, showing only one report of back pain prior to the current review in May 2015 after Plaintiff reportedly moved a couch.  (ECF No. 11, p. 255).  Officer North also noted medical treatment in September 2015 for a fractured right thumb "when turning a four-wheeler over and landing in a tree."  *Id*.  As the record does not indicate that Plaintiff was prescribed any regular medications during this period, Officer North concluded that there was "no current longitudinal evidence of restrictions related to chronic back pain or treatment sought for the relief of reported chronic back pain."  *Id*.

On July 13, 2017, Plaintiff returned to Dr. Alemparte following a recent stress test and echocardiogram.  (ECF No. 11-1, pp. 228-29).  Plaintiff was assessed with no recent chest pain, in sinus rhythm today, and well-controlled blood pressure.  *Id*. at 228.  Dr. Alemparte prescribed Carvedilol.[4]  *Id.*

Plaintiff reported to CNS Finley on August 2, 2017, that his shortness of breath and hypertension were much better on his cardiac medication and that he felt a little better, though his osteoarthritis had been flaring up.  (ECF No. 11-1, pp. 248-249).  The examination revealed tenderness throughout the lumbar spine into the spinous processes, facet joints, and sacroiliac joints, as well as crepitus in his knees bilaterally.  *Id*. at 249.  There were no deformities.  *Id*.  Plaintiff was to continue Carvedilol, Cymbalta, and Meloxicam, and his middle finger pain would be monitored.  *Id*.

---

[4] Carvedilol is used to treat heart failure and high blood pressure.  *See* Carvedilol, https://medlineplus.gov/druginfo/meds/a697042.html (last accessed July 28, 2022).

In September 2017, hand surgeon James Kelly, M.D. evaluated calcinosis of Plaintiff's right third and fourth fingers and ultimately excised a mass from these two fingers of the right hand. (ECF No. 11-1, pp. 236-237).  At a follow-up with Dr. Alemparte in October 2017, Plaintiff was stable cardiac-wise, and his medications were continued with an increase in Carvedilol.  *Id*. at 265-266.

Due to abdominal pain and vomiting, Plaintiff had an ER visit with Richard Daily, M.D., on November 17, 2017. (ECF No. 11-1, pp. 335-369).  Plaintiff had a small easily reduced umbilical hernia that was non-tender and exhibited normal muscle tone.  *Id*. at 338.  The surgery consult indicated Plaintiff likely had ileus.  *Id*. at 353.  He underwent decompression of stomach and improvement, if not resolved, SBO/ileus.  *Id*. at 369.  Plaintiff was discharged two days later. *Id*. at 342.

After his hospital admission for intestinal blockage, Plaintiff saw CNS Finley on November 29, 2017, for a routine follow-up for his back and knee pain.  (ECF No. 11-1, pp. 397-398).  On examination, Plaintiff continued to demonstrate tenderness throughout his lumbar spine into the spinous processes and crepitus in bilateral knees.  *Id*. at 398.  While Plaintiff exhibited a decreased range of motion in the right middle finger, it had improved with surgery.  *Id*.  It was noted that Plaintiff's current medications were doing "wonderfully well."  *Id*.

The record then indicates a 17-month period with no evidence of treatment.

On May 22, 2019, Plaintiff established care with Mirfat Bird, M.D.  (ECF No. 11-1, pp. 275-290).  Plaintiff reported wrist pain, feet numbness, and joint pain.  *Id*. at 275.  On examination, he had normal range of motion, was oriented, had normal mood, and was in no acute distress.  *Id*. at 276.  Plaintiff did exhibit deformity and swelling in the proximal interphalangeal ("PIP") joints of the right and left middle finger.  *Id*.  The treatment plan included lab testing to identify any

rheumatologic issues for hand arthritis and x-ray imaging.  *Id*. at 278.  Bilateral hand x-rays showed some calcification adjacent to the PIP joint of each middle finger, more extensive on right, and minimal degenerative changes otherwise.  *Id*. at 287.  A left shoulder x-ray the following day revealed no bony abnormality.  *Id*. at 290.

On August 6, 2019, Plaintiff followed up with Dr. Bird for medication management.  (ECF No. 11-1, pp. 412-414).  Plaintiff complained of the same aches and reported some trouble obtaining his prescription for tramadol[5] from his pharmacy as they needed a week-to-week prescription.  *Id*. at 414.  Otherwise, Plaintiff reported that he was doing fair.  *Id*.  He exhibited a lumbar scar upon examination but demonstrated a normal range of motion of the musculoskeletal system.  *Id*. at 415.  Along with tramadol, Dr. Bird prescribed buspirone and tizanidine.[6]  *Id*. at 412.

Plaintiff endorsed anxiety, stress, and right-hand swelling and pain during his appointment with Dr. Bird on August 22, 2019.  (ECF No. 11-1, pp. 429-430).  His examination was unchanged from his previous appointment, and he received tizanidine for chronic low back pain with sciatica.  *Id*. at 430.  Dr. Bird also prescribed buspirone for anxiety and scheduled an echocardiogram for chronic myocarditis.  *Id*.

In September 2019, Plaintiff sought treatment with Theresa Fontaine, NP, for right wrist pain.  (ECF No. 11-1, pp. 421-427, 433-443).  Plaintiff was in no acute distress and demonstrated a normal grip, but he also exhibited pain with abduction, adduction, flexion, and extension.  *Id*. at 423.  An x-ray of the right wrist showed no acute abnormality.  *Id*.  An MRI of the right wrist

---

[5] Tramadol is a narcotic used to relieve moderate to moderately severe pain.  *See* Tramadol, https://medlineplus.gov/druginfo/meds/a695011.html (last accessed July 28, 2022).

[6] Buspirone is used to treat anxiety.  *See* Buspirone, https://medlineplus.gov/druginfo/meds/a688005.html (last accessed July 28, 2022); tizanidine is used to relieve spasms and increased muscle tone caused by MS, stroke, or brain or spinal injury.  *See* Tizanidine, https://medlineplus.gov/druginfo/meds/a601121.html (last accessed July 28, 2022).

showed a possible small focal tear in the triangle fibrocartilage complex; some focal signal abnormality scapholunate ligament that could be degenerative; degenerative changes in the first carpometacarpal joint with likely some minimal degenerative signal lunate bone; and possibly some mild synovitis with synovial thickening in the restyloid recess. *Id*. at 433. Plaintiff also underwent an echocardiogram showing normal LV systolic function and ejection fraction of 60%. *Id*. at 443.

On January 1, 2020, Plaintiff reported to Dr. Bird that he had lost his insurance and saw Dr. Westbrook for a time. (ECF No. 11-1, pp. 500-502). Plaintiff complained of back pain, wrist numbness, and knee pain. *Id*. at 500. On examination, Dr. Bird observed that Plaintiff had a normal range of motion and no tenderness. *Id*. at 502. He was given tramadol for hand arthritis and low back pain with sciatica. *Id*.

Plaintiff returned to Dr. Bird on May 5, 2020, complaining of increased back pain and reporting that he could not take muscle relaxants due to drowsiness. (ECF No. 11-1, pp. 493-497). The examination showed a positive straight leg raise on the left at 20 degrees and edema in bilateral lower legs. *Id*. at 495. Dr. Bird observed a normal range of motion and referred Plaintiff to physical therapy for back pain with sciatica. *Id*. A lumbar spine x-ray showed "a slight curvature of the lumbar spine to the left with no acute abnormality seen." *Id*. at 497. It was also noted that the January 30, 2009, lumbar myelogram showed a bilateral spondylolysis at L5, however, such findings were "not definitely appreciated on these routine radiographs." *Id*.

On May 18, 2020, Plaintiff began physical therapy to address his low back pain and sciatica. (ECF No. 11-1, pp. 461-489). Plaintiff reported during his initial evaluation that he tried not to take narcotics but sometimes took Aleve or Tylenol. *Id*. at 489. During his first few steps, Plaintiff demonstrated a slow cadence gait with antalgia and rated his pain between two and five

out of ten.  *Id*.  The initial presentation was determined to be a fluctuating lumbar neural tissue irritation with local muscle spasms and decreased mobility and activity tolerance.  *Id*.  Plaintiff continued with sessions through June 2020, and based on his progress, it was recommended that he be discharged from his current therapy course and continue independently at home on June 10, 2020.  *Id*. at 462-487.

Plaintiff saw Dr. Bird for rib pain on July 6, 2020.  (ECF No. 11-1, pp. 456-458).  Plaintiff reported attending physical therapy, but he did not feel better.  *Id*. at 456.  Findings of the examination were unchanged from the previous visit, showing positive straight leg raise on the left at 20 degrees, edema in bilateral lower legs, and a normal range of motion.  *Id*. at 457.  Per the assessment, Plaintiff took his muscle relaxer and very rarely took his tramadol.  *Id*. at 458.  Dr. Bird referred him for a lumbar spine MRI and renal ultrasound.  *Id*.

On July 24, 2020, Plaintiff had the lumbar spine MRI and renal ultrasound.  (ECF No. 11-1, pp. 459-460).  The lumbar spine MRI showed chronic bilateral pars defects L5 with grade I anterolisthesis L5 upon S1 and associated moderate degenerative disc space narrowing; multilevel disc degeneration and mild degenerative facet arthropathy in the lower lumbar spine; mild disc protrusion at L5-S1 with moderate left foraminal stenosis; post-surgical laminotomy changes on the right L4-L5; ventral epidural material consistent with disc protrusion or epidural granulation tissue; and facet hypertrophy at this level contributing to mild canal stenosis.  *Id*. at 460.  The renal ultrasound revealed normal-sized kidneys without hydronephrosis.  *Id*. at 459.

Plaintiff returned to Dr. Bird for back pain, right leg numbness, and left side rib pain on August 19, 2020.  (ECF No. 11-1, pp. 451-453).  Plaintiff weighed 247 pounds with a BMI of 30. *Id*. at 452.  The examination was again unchanged, showing positive straight leg raise on the left at 20 degrees, edema in both lower legs, and a normal range of motion.  *Id*. at 452-453.  Tramadol

for hand arthritis was refilled, and Dr. Bird referred Plaintiff to neurosurgery for back pain with sciatica and history of lumbar laminectomy.  *Id*. at 453.

### III.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision.  *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.   20 C.F.R. § 404.1520(a)(4).   The fact finder only considers a plaintiff's age, education, and work experience in the light of his residual functional capacity if the final stage of the analysis is reached.   20 C.F.R. § 404.1520(a)(4)(v).

## IV.    Discussion

Plaintiff raises a sole issue on appeal: whether the ALJ erred in finding medical improvement related to Plaintiff's ability to work resulting in an RFC finding unsupported by substantial evidence.   After thoroughly reviewing the record, the undersigned finds that the ALJ did not err in finding medical improvement related to Plaintiff's ability to work, and substantial evidence supports the RFC finding.   Thus, the ALJ's decision to deny benefits in this case is supported by substantial evidence.

### A.    Medical Improvement Related to Ability to Work

Plaintiff contends that this case is solely a medical improvement case, and as such, the analysis should be whether Plaintiff's conditions improved since the Comparison Point Decision ("CPD"), which is the date of the last decision finding Plaintiff disabled.[7]   (ECF No. 14).   While

---

[7] At the outset, we note that while Plaintiff's Brief cites to regulations and the record, it does not cite any caselaw to support its positions.   It is well-settled that issues Plaintiff adverts to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.   A passing reference to an issue will not suffice to bring that issue before this Court.   Further, a skeletal argument, really nothing more than an assertion, does not preserve a claim.   "Judges are not like pigs, hunting for truffles buried in briefs."   *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).   Compelling the Court "to take up a burdensome and fruitless scavenger hunt for arguments is a drain on its time and resources."   *D.O.B. ex. Rel Dudley v. Astrue*, 2011 WL 3739366, at *2 (S.D. Ind. Aug. 3, 2011).

he concedes that his mental impairments have improved, Plaintiff argues that his physical impairments have not improved. *Id*. at 1-2. Plaintiff argues that medical evidence of record since the CPD show the same, if not worsening, conditions as those when Plaintiff was previously found to be disabled. Plaintiff specifically argues that his severe impairment of degenerative disc disease of the lumbar spine post-surgery has worsened. *Id*.

Plaintiff notes that the RFC found at the CPD restricted Plaintiff to sedentary work with additional limitations, including occasional climbing of ramps, balancing and stooping, but never climbing scaffolds, ropes, or ladders, kneeling, crouching, or crawling, and he would be unable to complete a normal workday and work week due to severe pain. (ECF No. 14, p. 2). Plaintiff asserts that this CPD RFC finding was based upon Plaintiff's severe impairment of degenerative disc disease of the lumbar spine post-surgery. *Id*. He contends that the medical record shows worsening findings of that impairment, contrary to what the ALJ found in his decision. *Id.* at 3-4. Plaintiff insists that worsening objective medical evidence findings do not support a determination that Plaintiff can now perform light work, and that he can now occasionally climb, balance, crawl, kneel, stoop or crouch—the ALJ's RFC finding in this case. *Id*. at 4-5. Additionally, Plaintiff argues that improved mental impairments do not support a finding of improved physical impairments. *Id*. at 6.

"Although a claimant seeking social security disability benefits bears the initial burden to demonstrate that she is disabled, once she meets that burden, the burden shifts to the Commissioner of the Social Security Administration to show that she is no longer disabled based on medical improvement. 20 C.F.R. § 404.1594(f)." *Koch v. Kijakazi*, 4 F.4th 656 (8th Cir. 2021). A claimant in a disability benefits case has a continuing burden to demonstrate that he is disabled, and no inferences may be drawn from the fact that he has previously been granted benefits. *See Nelson*

*v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir. 1991) (citing Social Security Act, § 223(f), as amended, 42 U.S.C. (1982 Ed.) § 423(f)).

"When benefits have been denied based on a determination that a claimant's disability has ceased, the issue is whether the claimant's medical impairments have improved to the point where he is able to perform substantial gainful activity." *Delph v. Astrue*, 538 F.3d 940, 945-46 (8th Cir. 2008) (citing 42 U.S.C. § 423(f)(1)). This "medical improvement" standard requires the Commissioner to compare a claimant's current condition with the condition existing at the time the claimant was found disabled and awarded benefits. *See* Social Security Act § 223, 42 U.S.C.A. § 423(f)(1); 20 C.F.R. § 404.1594(f); *Delph v. Astrue*, 538 at 945-46.

Under 20 C.F.R. § 404.1594, the Commissioner must determine whether a claimant's disability has ceased by following an eight-step evaluation process: (1) whether the claimant is currently engaging in substantial gainful activity; if not, (2) whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment; (3) whether there has been a medical improvement; (4) if there has been a medical improvement, whether it is related to the claimant's ability to work; (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies; (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe; (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity; and (8), if the claimant is unable to do work performed in the past, whether the claimant can perform other work. *See Dixon v. Barnhart*, 324 F.3d 997, 1000-1001 (8th Cir. 2003) (citing 20 C.F.R. §

404.1594(f)).  "This sequential analysis for cessation of benefits includes the five steps to be followed in an initial disability determination."  *Delph v. Astrue*, 538 at 945-46.

When a claimant appeals a determination of medical disability cessation, the adjudicator must evaluate the issue of disability at the time of the initial cessation determination and at any time through the date of the determination or decision.  Social Security Ruling 13-3p.  The adjudicator must specifically address the initial cessation determination and the claimant's eligibility (or ineligibility) for a new period of disability through the date on which the appeal determination or decision is being made, or, if earlier, through the date last insured.  *Id*.

Here, Plaintiff was found disabled in July 2009, and his disability started in February 2009.  (ECF No. 11, pp. 147-155).  The ALJ's decision at that time "expected medical improvement" and scheduled reassessment in 24 months.  *Id*.  In 2012, Plaintiff completed his paperwork for continuing disability, and the fact finder found that his disability had continued.  *Id*. at 156-157.  This finding was based on the fact that there was no evidence of medical improvement.  *Id*. at 157.

Plaintiff did his paperwork for continuing disability again in 2016.  (ECF No. 11, pp. 533-550).  At that time, an investigation report was ordered because there were some questions as to Plaintiff's credibility.  (ECF No. 11-1, pp. 100-157).  The investigation revealed that Plaintiff represented himself online as someone who regularly and actively engaged in physical, outdoor activities, including traveling long distances, riding motorcycles, riding ATVs, fishing, cooking inside and outside, doing yard work, and helping care for in-laws.  *Id*. at 105-110.  Based on these findings, it was determined that Plaintiff's level of activity was inconsistent with his claims of disabling symptoms, and Officer North accordingly found that medical improvement had occurred in Plaintiff's case.  (ECF No. 11, pp. 246-260).

Plaintiff requested a hearing and received an unfavorable decision. (ECF No. 11, pp. 161-180). Following an Appeals Council remand, Plaintiff received a second unfavorable decision. *Id*. at 91-108, 183-186, 188-210. Following a second Appeals Council remand, Plaintiff received a third unfavorable decision. *Id*. at 14-37, 213-215). Plaintiff was denied Appeals Council review this time around, *Id*. at 8-11, and he initiated the case at bar.

Throughout the lengthy procedural history, including one Disability Hearing Officer decision and three Administrative Law Judges' decision, much discussion of Plaintiff's physical impairments revolves around Plaintiff's reported and investigated physical activities of daily living. While objective medical evidence remained unchanged, including x-rays and MRIs, an investigation revealed an active lifestyle inconsistent with Plaintiff's reported disabling symptoms. Further, there is a period of 17 months during which Plaintiff did not seek any medical care, and if he did, no evidence is found in the record of such care. While Plaintiff insists on appeal that *physical* medical improvement has not occurred since the CPD, Plaintiff misunderstands the standard of review in this case.

The eight-step evaluation process to determine whether a claimant continues to be disabled must be taken in the order given under the regulations, restated here in relevant part:

> At step three, the undersigned must determine whether medical improvement has occurred (20 CFR 404.1594(f)(3)). Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings (20 CFR 404.1594(b)(1)). If medical improvement has occurred, the analysis proceeds to the fourth step. If not, the analysis proceeds to the fifth step.

> At step four, the undersigned must determine whether medical improvement is related to the ability to work (20 CFR 404.1594(f)(4)). Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities (20 CFR 404.1594(b)(3)). If it does, the analysis proceeds to the sixth step.

At step five, the undersigned must determine if an exception to medical improvement applies (20 CFR 404.1594(f)(5)).  There are two groups of exceptions (20 CFR 404.1594(d) and (e)).  If one of the first group exceptions applies, the analysis proceeds to the next step.  If one of the second group exceptions applies, the claimant's disability ends.  If none apply, the claimant's disability continues.

At step six, the undersigned must determine whether all the claimant's current impairments in combination are severe (20 CFR 404.1594(f)(6)).  If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled.  If they do, the analysis proceeds to the next step.

At step seven, the undersigned must assess the claimant's residual functional capacity based on the current impairments and determine if he can perform past relevant work (20 CFR 404.1594(f)(7)).  If the claimant has the capacity to perform past relevant work, his disability has ended.  If not, the analysis proceeds to the last step.

20 C.F.R. § 404.1594.

ALJ Davis properly proceeded through this eight-step evaluation, determining at step three that medical improvement had occurred.  (ECF No. 11, p. 19).  In his decision, the ALJ set out Plaintiff's medically determinable impairments at the time of the CPD – degenerative disc disease of the lumbar spine status post-surgery, major depressive disorder, and generalized anxiety disorder.  *Id*. at 19.  He then restated the Plaintiff's CPD RFC based on said impairments, including restrictions specifically related to Plaintiff's mental impairments.  *Id*.  "From a mental standpoint, the claimant could perform work where interpersonal contact was incidental to the work performed, complexity of tasks was learned and performed by rote with few variables and use of little judgment.  Supervision required was simple, direct, and concrete."  *Id*.

Next, the ALJ determined the severe impairments claimant continued to have since May 1, 2017, the date Plaintiff's disability ceased.  (ECF No. 11, p. 19).  He explicitly found that Plaintiff's impairment of degenerative disc disease at L4-5 and L5-S1 status post laminectomy caused more than minimal limitation in his ability to perform basic work activities.  *Id*.  After finding that no

combination of impairments met or equaled a listing, ALJ Davis then proceeded to step three, the medical improvement question. *Id*. at 19-20.

In his step three finding, the ALJ determined that Plaintiff's impairments of depression and anxiety improved and did not cause more than a minimal limitation in his ability to perform basic mental work activities as of May 1, 2017. (ECF No. 11, pp. 20-21). The ALJ found that Plaintiff's "medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas," making it non-severe under 20 C.F.R. § 416.920a(d)(1). *Id*. at 21. As such, ALJ Davis correctly found that "there had been a decrease in medical severity of the impairments" and medical improvement occurred on May 1, 2017. *Id*. at 20. Thus, contrary to Plaintiff's assertion, the ALJ did not make a medical improvement finding based on physical impairments; rather, he based his finding of medical improvement on Plaintiff's mental impairments.

Notably, Plaintiff concedes this point and admits that "mental limitations set forth in the CPD have in fact improved." (ECF No. 14, p. 2). He goes on to say that he concurs "with the ALJ to the extent that medical improvement has occurred as it relates to the Plaintiff's mental symptoms." *Id*. As "medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs, and/or laboratory findings," the ALJ properly concluded, and Plaintiff agrees, that medical improvement occurred based on a decrease in medical severity of Plaintiff's mental impairments.

As the regulations advise, the ALJ proceeded to step four and found that medical improvement was related to Plaintiff's ability to work. (ECF No. 11, p. 20-21). "Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities." 20 C.F.R. § 404.1594(b)(3). As medical improvement occurred regarding Plaintiff's mental impairments, he would no longer need the limitations based on said

mental impairments as set out in the CPD RFC.  Without those mental limitations, Plaintiff's capacity to perform basic work activities increased.  As such, we hold that the ALJ did not err in finding that medical improvement related to Plaintiff's ability to work occurred in this case.

## B.    Substantial Evidence Supports the RFC Finding

Plaintiff also argues that his physical impairments have not improved, but worsened, such that objective medical evidence does not support the ALJ's RFC finding that Plaintiff can perform a limited range of light work, including occasional climbing, balancing, crawling, kneeling, stooping, or crouching.  (ECF No. 14, pp. 2-6).  Plaintiff insists that objective medical evidence of his physical impairments remain unchanged or worsened when compared to the evidence available at the time of the CPD, the date Plaintiff was most recently found disabled.  *Id.*

Plaintiff's apparent misunderstanding of the continuing disability evaluation process taints his argument on this issue.  An ALJ's RFC finding in a continuing disability review case occurs at step seven of the eight-step evaluation process, and only after a finding in steps three and four that medical improvement related to the ability to work has occurred.  20 C.F.R. § 404.1594.  At step seven, the ALJ is then required to "assess the claimant's residual functional capacity based on the current impairments and determine if he can perform past relevant work."  *Id.* at 404.1494(f)(7). The comparison analysis of the previous steps does not apply once the ALJ arrives at step seven. At this stage, medical improvement is no longer the question presented to the ALJ and, therefore, no longer the standard by which the ALJ looks at the evidence.  Instead, at step seven, the ALJ conducts an RFC analysis based on Plaintiff's current impairments.  As such, Plaintiff's reliance on the comparison to his physical medical record at the CPD is misplaced.

As previously discussed, medical improvement, albeit of mental impairments, occurred in this case, thus requiring a new RFC finding by the ALJ.  Residual functional capacity ("RFC") is

the most a person can do despite that person's limitations.  20 C.F.R. § 404.1545.  "The ALJ

determines a claimant's RFC based on all relevant evidence in the record, including medical

records, observations of treating physicians and others, and the claimant's own descriptions of her

limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d

838, 844 (8th Cir. 2009).  Limitations resulting from symptoms such as pain are also factored into

the assessment.  20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit Court of Appeals has held that a

"claimant's residual functional capacity is a medical question."  *Miller v. Colvin*, 784 F.3d 472,

479 (8th Cir. 2015) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ's

determination concerning a claimant's RFC must be supported by medical evidence that addresses

the claimant's ability to function in the workplace.  *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir.

2012).

Here, the ALJ assessed Plaintiff with an RFC of "light work as defined in 20 C.F.R. §

404.1567(b) except that [Plaintiff] cannot be exposed to dust, fumes, smoke, or temperatures

extremes.  He can occasionally climb, balance, crawl, kneel, stoop, or crouch."  In so finding, the

ALJ considered all relevant medical records, observations of treating physicians and others, and

Plaintiff's descriptions of his limitations.

As to medical evidence, the ALJ considered the treatment record between July 13, 2016,

and August 19, 2020, showing conservative treatment and generally non-severe exam findings.

(ECF No. 11, pp. 22-23).  A consultative exam with Dr. Michael Westbrook in 2016 revealed a

normal physical examination.  The ALJ then considered treatment in May 2017 showing pain in

Plaintiff's right leg and right hip on active range of motion, twinging in his left hip, tenderness in

the lumbar spine, right hip, and sacroiliac joint.  It was noted that Plaintiff's conservative treatment

plan for these findings included in-home physical therapy instruction, ice, and over-the-counter

anti-inflammatories.  (ECF No. 11, p. 22).  Objective medical evidence from May 2017 included an MRI of the lumbar spine that was noted to be unchanged from March 2009.  *Id*.

The ALJ considered treatment from August to November 2017, showing tenderness with palpation in the lumbar spine, spinous process, facet joints, sacroiliac joints.  (ECF No. 11, p. 22). The ALJ noted Plaintiff's reports to his treatment provider that he was feeling a little better despite an osteoarthritis flare up and continued low back pain.  *Id*.  While Plaintiff displayed crepitus in the knees bilaterally during examinations, the rest of his joints were normal.  By November, the ALJ noted, Plaintiff's physical examination remained unchanged as did his medication management plan.  *Id*.

After a noted gap in treatment of 17 months, the ALJ considered treatment records from May 22, 2019, to September 5, 2019.  (ECF No. 11, pp. 22-23).  The ALJ noted that much of the treatment from this period focused primarily on Plaintiff's complaints of hand pain, though complaints of numbness in legs and joint pain continued.  As the ALJ noted, physical examinations showed proximal interphalangeal of the right and left middle fingers, but normal range of motion in Plaintiff's musculoskeletal system.  The record shows and the ALJ noted that Plaintiff reported doing "fair" at an August 6, 2019, examination and demonstrated a normal range of motion in his extremities with no edema or tenderness.  By September, Plaintiff was encouraged by his treatment provider to exercise daily.  *Id*.

Next, treatment records from January 21, 2020, to August 19, 2020, were considered by the ALJ.  (ECF No. 11, p. 23).  The ALJ noted that physical examinations regularly showed a positive straight leg raise test on the left with bilateral lower extremity edema.  However, the ALJ also noted that examinations regularly showed otherwise normal range of motion of the musculoskeletal system and no tenderness of the lumbar spine.  Plaintiff completed physical

therapy between May and June and reported that he rarely needed to take his prescribed Tramadol, though he took muscle relaxers.  The ALJ reviewed a lumbar spine MRI showing mild to moderate findings, including chronic bilateral pars defects, mild disc protrusion at L5-S1 with moderate left foraminal stenosis, and facet hypertrophy contributing to mild canal stenosis.  *Id.* at 23.  By August, the ALJ noted that Plaintiff's examination remained unchanged, and medications were refilled.  As Plaintiff continued to complain of back pain with sciatica, the ALJ considered that Plaintiff was referred to neurosurgery at this time.  *Id.*

As to observations of treating physicians and others, the ALJ considered the opinions of a consultative examining physician and state agency medical consultants.  Dr. Westbrook's opinion from September 20, 2016, assessed Plaintiff with moderate limitations.  (ECF No. 11, p. 25-26).  The ALJ found this opinion persuasive as Dr. Westbrook examined Plaintiff and his findings were consistent with the record and supported by Plaintiff's various daily activities, few abnormal physical examinations, and MRIs showing years of stable conditions.  *Id.* at 26.  The ALJ also considered and found unpersuasive the opinions of state agency medical consultants, Drs. Jim Takach and Jon Mourott, assessing Plaintiff with no severe physical or mental impairments.  The ALJ noted that additional evidence submitted at the hearing indicated Plaintiff has severe physical impairments.

As to Plaintiff's subjective complaints, the ALJ also considered Plaintiff's hearing testimony asserting that muscle spasms, numbness in his right leg and hands, and low back pain prevented him from working.  (ECF No. 11, pp. 23-24).  As to the photo evidence revealed in Plaintiff's investigation, the ALJ noted that Plaintiff denied doing the activity depicted in a photo he posted as he was not in the photo; explained that photos of his motorcycle were taken prior to his back surgery; and admitted that he posted a photo of himself riding a scooter "to be funny."

The ALJ noted Plaintiff's reported limitations as stated in his testimony, including the ability to stand for just 10 minutes, sit for some time if he could move around, and inability to lift a gallon of milk with his right hand. *Id*. at 23.

ALJ Davis also considered Plaintiff's reports of constant pain in his hip, leg, back, right shoulder, and right hand all exacerbated by activities such as walking, standing, and sitting. (ECF No. 11, pp. 24-25). The ALJ also noted that Plaintiff's pain appeared to be well-controlled with conservative medication as his treating physicians maintained him on Meloxicam. *Id*.

Upon reviewing this evidence, the ALJ determined that Plaintiff's impairments could have produced the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of said symptoms were not entirely consistent with the evidence. (ECF No. 11, pp. 24-25). In particular, the ALJ noted that Plaintiff's treatments had been relatively conservative with medications and physical therapy. His objective medical tests, including an MRI, showed no change in his conditions while treatment providers maintained him on the same medications without changes. The treating physicians also encouraged Plaintiff to exercise. *Id*.

The ALJ also identified evidence in the record demonstrating that Plaintiff "leads a fairly active lifestyle" despite the medical findings and his complaints of disabling symptoms. (ECF No. 11, p. 24). The ALJ noted Plaintiff's involvement in Scouts, hunting, and going on at least one vacation requiring sitting in the car for an extended period. *Id*. The ALJ also considered Plaintiff's reported activities of daily living, including watching television, attending to personal care, driving, leading Scouts, and attending church. *Id*. Noting additionally that no treating physician restricted Plaintiff's functioning, the ALJ found Plaintiff's generally active level of daily activities "in conjunction with the medical evidence demonstrating minimal abnormalities, reflects a significant functional capacity and not an individual unable to sustain regular and continuing work

due to medically determinable impairments." *Id*. at 26. Thus, ALJ Davis concluded that Plaintiff was not precluded from work activity within the RFC finding. *Id*.

A review of the lengthy record in this case reveals substantial evidence to support the ALJ's finding that medical improvement related to the ability to work occurred in Plaintiff's case after his disability was determined to have ceased in 2017. While many of Plaintiff's medical imaging reports show unchanged physical impairments, the treatment record demonstrates, and Plaintiff concedes, that limitations from his mental impairments have subsided such that said impairments no longer limit his ability to work. According to the eight-step evaluation process, the ALJ then properly conducted an RFC analysis to determine the most Plaintiff could do despite his remaining limitations as of the date his disability ceased. The record since that time demonstrates stable imaging results, few abnormal physical examinations, effectiveness of conservative medication, Plaintiff's statements that he very rarely even took all his medications allegedly needed for pain, and no physician-placed restrictions on Plaintiff's functioning.

In addition, we note the voluminous reports spanning several years attempting to evaluate Plaintiff's true level of physicality regarding his daily activities. The record of investigation and subsequent reviews from multiple levels of the Agency indicate that Plaintiff's reported activities were inconsistent with the medical evidence, and that his physical activities did not represent those of an individual so limited by his impairments that he could not work within restrictions set out by an RFC supported by substantial evidence. Notably, while ALJ Starr assessed Plaintiff with a limited range of sedentary work, the Appeals Council remanded this decision citing SSR 96-8p, reminding ALJ Starr that the "RFC is not the *least* a claimant can do, but the *most* he can do." (ECF No. 11, p. 213) (emphasis in original). The Appeals Council determined that additional consideration was needed specifically regarding Plaintiff's RFC, pointing to evidence of Plaintiff's

relatively active hobbies and treatment provider's notes that he was doing well despite medical evidence showing degenerative issues with lumbar spine, tenderness of the lumbar spine, and crepitus in knees.  *Id*.

A careful review of the record demonstrates that the ALJ properly considered the objective medical evidence, observations of treating sources and others, and Plaintiff's activities of daily living to arrive at the RFC determination assessing Plaintiff capable of a limited range of light work.  Accordingly, the undersigned finds that the ALJ's decision to deny benefits in this case is supported by substantial evidence.

### V.      Conclusion

Based on the foregoing, it is recommended that the ALJ's decision and the Commissioner's denial of benefits be affirmed, and that Plaintiff's Complaint (ECF No. 2) be DISMISSED WITH PREJUDICE.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 1st day of August 2022.

/s/Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE